Good morning, Your Honors. James Derrick, here representing the appellate St. Paul Fire & Marine Insurance Company. At this time, I'd like to reserve four minutes for rebuttal. All right. I will skip with the generalities and the summaries and go straight to discussing a couple of what I would call fundamental errors at the trial level that make it virtually impossible for this Court to affirm the judgment. The first fundamental error I would like to discuss is a fundamental instructional error. This error is so simple and so obvious and so brief that I'm afraid it might have been lost in all of the paper that gets submitted to the Court of Appeals. Well, talking about the instructional error, the Court wasn't wrong, but then there was, you know, at the time, certainly the Court was not wrong. But then since we've had some other legal clarification, or if you want to say a change in the law, whatever you want to say, I think you're both going to argue a little bit differently. But the part that the Court said wasn't wrong, but was it enough? Actually, what the Court said was wrong. Well, why? And that's what I was about to discuss. And this is the part that I think got lost in all of the briefing. So remind us what the instruction was before you tell us why it was wrong. That's where I'm going. This was discussed in the appellant's opening brief, by the way, at page 53. Each of the policies states... Okay, what was the... tell us the... The instructional error was the failure to inform the jury of critical policy language that clarifies... But what I ask you is what did the instruction that you're challenging, what did it actually say? It said that the policy state collapse does not include settling, cracking, bulging, shrinking, or expansion, close quote. And what was wrong with that? You're saying the policy did say that? It does say that. All three policies say that. And that is critical language because it puts limits on the concept of substantial impairment of structural integrity. St. Paul proposed an instruction informing the jury of this language. The court refused to give it. St. Paul accepted. And the failure to give that language is presumed harmful. Here's why it actually was harmful. Especially given the nature of this particular structure, a wood frame building. All of these levels of damage, cracking, bulging, expansion, that sort of thing, are signs of structural distress. You don't have to be an engineer to walk up to a wall and see that it's got cracks, it's bulging, that you've got a structural problem. There's something wrong with this wall. So you're saying that the court had to give that as a legal definition of collapse? I'm saying that the court had to inform the jury of what the policies had to say about that term and the limitations that the policies put on the use of that term. I thought the court was supposed to be instructing the jury on the law and the witnesses instructed the jury on what the facts were. Well, the insurance policies, I believe this was agreed prior to trial between the parties, the insurance policies were not submitted to the jury as exhibits for the obvious reasons that they're gigantic, complex legal documents and we don't want them. But you all agreed on that, right? Well, what's agreed is that the entire policy is not submitted to the jury. There's no agreement that we can't submit specific portions of the policy language that's crucial to the theory of the case. And did you submit that language? Yes. Okay, so the jury had that. No, no. It was submitted in the form of an instruction. The jury, what happens with this case is the jury is asked to make findings of fact. The court applies the law to the policies to determine what the coverage is. Well, if the jury wasn't supposed to make this determination, why would they need an instruction that says this? Because they did make the determination of when collapse occurred. And to do that, they had to know what collapse was and they had to know what collapse was not, which under the policies is not damage of this level. That seems very strange to me if you're asking the jury to determine what a policy provision means that the jury isn't given the policy language. That seems a pretty strange way to litigate a case. Well, I've litigated a bunch of coverage cases and this is the way I've always done it. And has the court always given the policy definition as a legal instruction? Sure. It's no different than instructing a jury on there is a statute that says this. I mean, that's a typical jury instruction. There is a statute that says that. That's the law. A statute is law. The policy provisions to me are agreements that the parties have made. It's not, it doesn't have the force and effect of law. Well, look, the legal question is what does collapse mean? The policy has to be considered when reaching that conclusion. That's the key question in the case, isn't it? What collapse means? Yes, that's certainly one of the key questions. But see, I even thought your argument was different than, the jury was told that it was substantial impairment of structural integrity, right? And then after... And given nothing else. And then after when they, and then after Queen Anne that it, Queen Anne didn't go to, it didn't require like complete collapse, but it said something if they could consider whether it's the, it has to do with the building can still be upright. So I thought that was your argument, not this that they had... I've made both arguments in my brief, Your Honor. So if the court had given the instruction that collapse had to, because they asked a question about if one beam or one member or whatever was enough. If they said, well, structural integrity, you know, has to do with, although this case happened after, but structural integrity goes to the building's ability to be upright. Would there be error then? Would there still have been error? I would not have proposed a instruction that simply said what you just said. I would have included a more complete definition. Well, but I'm asking you if that, if the court had said that, would you be able to say that it was error? It seems to me if the court, that's what I thought we were, you know, that's where I see the tension, not rejecting your... Instruction. Okay, well, let's talk about Queen Anne Park then. Before we leave that, counsel, is it your position that if you're, if you offer a contractual definition and that contractual definition is contrary to law, the court still must give the contractual definition as an instruction? I don't know how a contractual definition in a contract case can be contrary to law. I hate to argue with your question. If collapse is defined in the law one way, and you define collapse in your contract a different way, would it be error for the district court to decline to give your instruction and give the instruction that's provided in the law? I think the answer is, is that because it's a, the entire case is, revolves around the contract, the law is the interpretation of the contract. A interpretation that disregarded contract language would be erroneous. Even if that definition is inconsistent with the statutory definition? Well... Or the definition as determined by the highest court in the state? Absolutely. I mean, insurance companies can go back and revise their policies and define what the term collapse means. But this is where I'm actually going to go to Queen Anne Park now. Let's read Queen Anne Park. Substantial impairment of structural integrity means substantial impairment of the structural integrity of a building or part of a building that renders such building or part of a building unfit for its function or unsafe. And under the clear language of the insurance policy here, must be more than mere settling, cracking, shrinkage, bulging, or expansion. So the language I'm talking about is the law under Queen Anne Park. And it was the law at the time the court refused to give the instruction because it was the language under the, it was part of the clear language of the insurance policy that the, that the jury needed to have so they could be guided in their determination of whether or not there was a collapse. There is really no tension here between the court's definition of collapse and what the policy had to say about it. The court's definition incorporates the policy language. Did either expert that testified at trial opine on whether the building had been rendered unfit for its function? I don't think you'll see a statement like... The answer is no, isn't it? The answer is no. I think what you'll hear from Houston is that their expert said it was, quote, dangerous, close quote, under a particular engineering code or definition. And they'll say, well, dangerous means unfit. The problem with that is that, well, let me tell you, let me put it this way. The problem with substantial impairment of structural integrity, standing alone, just that word, is you can take the word substantial. What does that mean? Nobody knows. You can take that concept because it's so amorphous and run with it to the point where you're talking about damage that really has nothing to do with the concept of the actual falling down, threatening. Now, it doesn't have to fall down, but even threatening the actual structural integrity of the building. Counselor, do you think it would be helpful for this case to be remanded for the district court to take another look at it under the Queen Anne decision? I think that's absolutely required to do that. I think though remanding it strictly on that basis would simply multiply some of the other areas. We could do that and submit it to the jury again under a Queen Anne Park instruction, I'll call it, and see what the jury had to say about that. So you would accept a remand, but what you really think is a reversal? I think a reversal can be justified on a number of grounds, but a remand certainly is... All you have to do is say yes. Yes, sorry. Yes. All right. You have three minutes left. Yes, I want to talk about another, what I think is a fundamental error, which is... Chair, you have three minutes left. That's not for... Oh, okay. You've got a lesson there. Thank you. Good morning, Your Honors. Good morning. My name is Devon Thirtle-Anderson. I represent Houston General Insurance Company, the appellee in this case. And you're correct that the primary issue in this case is this definition of collapse, and particularly how Queen Anne affects the definition of collapse. And as we... But we know here that the jury asked a question, and they seem to be... You know, I don't know what we make of that. I mean, I'm not... Because we can't really go into exact... We don't know where that comes from, but we do know that they were struggling with it. And then had it been, you know... I mean, would you... Do you concede that we're able to consider since the law on appeal now? Able to consider what exactly? Well, since Queen Anne came after, you know, that this happened, is an appellant in a position to claim that that's the law that should have been given at the time? No, I don't think so. And that's for a couple of reasons. Number one, at the time the case decided substantial structural impairment was the law. I know, but this case has come down before it was final. So there seems to be some support for the fact that if new law comes down before it's final, they're able to argue it here. Right. And here's the more important point, is that we have already determined... We've had a jury determination of the Queen Anne definition of collapse in our case already. Our jury instruction explained that collapse means substantial impairment of structural integrity, or SSI. Now, in order to find that in our case, our jury had to look at each of the various experts' testimonies. And if you take a look at Houston's... What was their question? What was their question? What was the jury question? What does SSI mean? No, but they asked a question about if it was one member or one beam or something. What was the question? The question that the jury asked the judge. During the deliberations. What was the question? Who responded by saying, that's a fact determination for you to make. Oh, right. That question, they were asking about, can a single member... Essentially, a single structural member in a building, if that is in a state of SSI, can that constitute SSI? Well, but if you think that Queen Anne said that whether it is substantial, it wrapped in the... It's the ability for the building to keep standing up. If the court had instructed that at that time, how do we know they would have come to the same verdict if they're talking about a single member? Here's how I think we know that. We know that because Houston's expert explained that we only get substantial structural impairment. We only get SSI if we do an analysis under the building code and we take a look at the building code and we look at specifically the definition of dangerous under the building code. If a building or a part of a building is, quote, dangerous, as that term is defined under the building code, then that's when Houston's expert said, yes, I have SSI in this building or the part of the building. But then they wouldn't have come back with that question if they understood that to mean what you're saying, that a building as a whole was in a dangerous state. Well, that's not what the policy or Queen Anne says. The policies themselves say there's collapse if a building or any part, or excuse me, we cover collapse of a building or any part of a building. So the definition or excuse me, the universe of collapse within the policy is very broad. Did you object when the other, were you the trial counsel? Yes, Your Honor. Did you object when the jury instruction, including the definition of collapse under the policy was offered? Well, that's not actually, we did object and it's not what Mr. Derrick was referring to. That's not a definition of collapse. What it says is what collapse is not. And collapse is not settling, shrinking, expansion, et cetera. But you objected to that being offered by the court as part of the instructions? Yes, we did. And here's the reason, well, at least one of the reasons, and that's because in our case, there was no evidence of settling, shrinking or expansion. Yes. Is there any difference in the language defining collapse in the policy involved in the Queen Anne versus State Farm case in this case? No. Same policy, isn't it? Yes. And if this case had never been tried before and were tried tomorrow in district court down the street, wouldn't the instruction that your opponent offered have to be given? I think that would be not the settling, shrinking, or expansion portion necessarily. Washington Supreme Court says collapse means substantial impairment of structural integrity, which means impairment of the structural integrity of the building or part of a building that renders such building or part of a building unfit for its function or unsafe under the clear language of the insurance policy here must be more than settling, cracking, shrinking, bulging, or expansion. That instruction would have to be given if this policy were contested in a trial in district court in the Western District of Washington tomorrow, correct? I don't know that the latter... Can you answer that question with a yes or no? No. Okay. Why wouldn't this instruction have to be given? Because the latter part of it is taken directly from the policy language. It's not an interpretation of law. It is the policy itself. And the language of the policy itself is what that policy means is a question of fact. And in this case, the parties agreed to omit that fact from the fact finders information. And even if we had given that instruction, it wouldn't have made a difference because Houston's evidence of collapse was not settling, shrinking, or expansion. Houston's evidence of collapse was, is this dangerous as that term is defined in the building code? But Houston's expert... Well, okay. The two experts don't say the same thing. So the jury could have looked at... You said that the jury had to have followed your expert. But if the jury had been given a more complete instruction or given what Queen Anne requires now, then they might have looked at another expert differently. I don't think they would because the difference between the two experts in this case was on the one hand, Houston's experts said SSI, the way I'm calculating it from an engineering standpoint, SSI is when a building or part of the building becomes dangerous as that term is defined in the building code. On the other hand, St. Paul's experts were saying, no, it's not dangerous. Here's all the reasons we think it's not, as a matter of fact, dangerous. Did St. Paul's experts say that the building had been rendered unfit for its function? No, sir. Or unsafe? No, St. Paul's did not. Houston's did. And doesn't Queen Anne require that? Yes, it requires... Yes, Queen Anne requires a factual... That's the state of Washington law right now as we speak. Yes, a factual finding that the building is either unfit or unsafe. And here we have the unsafe. Why shouldn't this case be remanded for new proceedings based on the clarification of Washington law? Because even though the Queen Anne court has clarified Washington law, it's not actually any different than what the jury was instructed and what they made their decision on in this case. Because Queen Anne says it's substantial structural impairment. The jury was instructed in that. And Queen Anne says it also means that the building has to be either unfit or unsafe. And in this case, the jury was essentially given two competing expert opinions on the issue. On St. Paul's side, the expert says, this building is perfectly safe. How can you say it's substantially structurally impaired? On Houston's side, you have an expert saying, this building is dangerous. And I know that because I calculated dangerous as that term is defined in the building code. And between that competing expert testimony, the jury went with Houston on the three travelers policies. So there were a few more issues that St. Paul raised in its briefing that I think can be handled fairly quickly. Issue number one and two, both had to do with the way in which, essentially the timing of when Houston's contribution cause of action arose. The first issue is an issue reviewed de novo. And that issue is whether the trial court correctly applied the law by holding that Houston's contribution claim was valid and enforceable at the time Houston made the settlement. Now, St. Paul is saying that because the Lake West, the underlying insured lawsuit was later dismissed, somehow that destroys Houston's contribution several days after the contribution claim was filed. But that's not Washington law. Washington law says, we're gonna look at the case and the right of contribution, the extent to which that existed at the time of the settlement. And that's the Mutual of Enumclaw v. USF case. The same case answers the second question, which is St. Paul's arguing that because the jury in our case ultimately found no coverage under the Houston policy, that Houston was somehow a volunteer and should never have paid in the first place. Well, again, Washington law is very clear that an insurer who settles under the threat of settlement litigation is not a volunteer. And the fact that the jury later determined there was no actual coverage under the Houston policies, that again is handled by Mutual of Enumclaw v. USF that says we're not gonna look at anything that happened after the settlement. We're just gonna look at the party's rights and responsibilities at the time of settlement. And we're going to make our contribution determination based on that information. Counsel, you previously said that the parties agreed not to submit those factual issues. Was there a written stipulation to that effect? To be honest, I don't recall at the moment. It may have been in the motions in Lemonade, but I'd be happy to find that for you. And that was also something that St. Paul's attorney just addressed. Next, St. Paul argues that it was somehow denied a right to a jury trial in this equitable proceeding. And St. Paul's argument is based on a misunderstanding of the liability that the reasonableness hearing and the reasonableness process envelop. St. Paul has explained that, look, the reason we have a reasonableness hearing is because we want the responsible insured, where the insured is the defendant, to settle with the injured party, even if the insured's insurer isn't going to pay that injured party so that you can go after the insurer later. That's only part of the point of a reasonableness hearing. The primary point of a reasonableness hearing is to apportion liability, excuse me, to establish a presumption of joint liability where two parties are jointly and severally liable for the same loss. So as two parties, defendants in the underlying litigation, two parties jointly and severally liable to Lake West for its cost to repair covered collapse, that is the trial court correctly interpreted that reasonableness process. There's sort of a lot of things that happened here that were a little bit weird because you got stuck with the default, right? No, it was another insurer. Well, it was, but then it turns out then it was set aside, but then that got reversed, and then you settled, right? Because actually Houston was the responsible, right? Right, so Tokyo is the former parent of Houston. But so that happened, and then on the other hand, you know, after you settled, St. Paul could have thrown in a little bit, but they chose not to and went to trial. But then at trial, it actually turned out that Houston wasn't responsible, right? Ultimately, that's what the jury found, yes. But Houston was responsible because it settled under the threat of litigation. Well, right, but this has a lot of little procedural twists and turns between these two companies. Yes, yes, it does, and it makes the case very interesting. Which has nothing to do with, you know, I mean, which has nothing to do with the people that actually suffered the loss. Right, and that's one of the reasons that Washington favors these contribution claims is so that insurers like Houston... Which I'm not going to decide it on sympathy, but it makes both of you less sympathetic. Then the people whose building was actually falling down. Thank you, your honor. What do you say to that? You know, I'm not... I'm not going to decide it on that. It's why I'm not, I'm not asking you to decide it on sympathy. It's the established public policy in Washington that insurers should make their insurance law. But there's all these little interesting little twists and turns between the two of you. For sure. That probably don't make people like insurance companies anymore. I don't know that they ever did. All right, my time is up. Thank you. Thanks, counsel. We'll hear rebuttal. I'd like to address the collapse question again. I think counsel made a misstatement during her argument. Houston's expert, you asked a question about the single member and the jury being confused about that. Houston's expert never tied the inability of individual members into the structural integrity of the building. Let me give you a physical example of what I mean. Very typical wood frame construction procedure would be to have, and this is discussed in St. Paul's expert testimony, would be to have three studs or pillars in the wall next to each other. Three two-by-sixes, for example. Any one of those two-by-sixes standing by itself would be enough to handle all of the loads that the code requires that wall to take. However, you use what's called a triple stud for a variety of reasons that have nothing to do with the structural integrity. It's to give surface area to hang drywall and go around corners and get windows in and things that have nothing to do with structural issues. Under Houston's analysis, every single one, although any one of those three was enough, every single one of those three had to pass the structural integrity test. In other words, you could have a member that was essentially sacrificial that could be completely taken out of the building with no effect, but they would call that substantial impairment of structural integrity because there was a bunch of decay in it. He linked it to the building code? Well, yes, it was linked to the building. The way they linked it is the code doesn't... The code at one point says any member because the code doesn't ask the question of whether that member is part of the structural integrity of the particular system it happens to be in. So it could be a member that is called fracture critical, in which case you take out that member, the thing falls down. It could be a member that really has no structural significance because all the other members near it... No, but let me ask you this. Did any of the evidence tend to show that the decay caused affected the building's ability to remain upright? Did any of the evidence? I would say no, that was never discussed. It never discussed that. And that's my point is the entire analysis was based on this idea that you could take individual members without tying them into the integrity of the building, the ability to stand upright and call that a collapse. Thank you, your honors. Thank you. Thank you to both counsel. The case just argued is submitted for decision by the court. The next case on calendar for argument is Siena Dale Lago Condominium Association versus Mount Holly Insurance Company.
judges: Hawkins, Rawlinson, Callahan